**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AMERICAN TRANSPORT GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | No. 17 C 7962 |
| v. | ) ) | Hon. Virginia M. Kendall |
| JOHN POWER and DIRECT TRAFFIC SOLUTIONS, INC., | ) ) ) ) | |
| Defendants, | ) ) | |
| JOHN POWER and DIRECT TRAFFIC SOLUTIONS, INC., | ) ) ) | |
| Counter-Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN TRANSPORT GROUP, LLC, | ) ) ) ) | |
| Counter-Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff American Transport Group, LLC ("ATG") brings suit against its former employee Defendant John Power and his new employer Defendant Direct Traffic Solutions, Inc. ("DTS") alleging breach of contract, tortious interference with a contract, tortious interference with business relationships, and civil conspiracy arising from the employment relationship between the Defendants. (Dkt. 1). Defendants have asserted a counterclaim against ATG alleging abuse of process. (Dkt. 37). Currently before the Court are Defendants' motion to dismiss ATG's complaint under Federal Rule of Civil Procedure 12(b)(6) (Dkt. 14), and ATG's motion to dismiss the counterclaim. (Dkt. 40). For the reasons set forth below, Defendants' motion is granted in part and denied in part and ATG's motion is granted.

1

**LEGAL STANDARD**

For a claim to survive a motion to dismiss brought pursuant to Rule 12(b)(6), it must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the complaint (or counterclaim) contains factual content that supports a reasonable inference that the defendants are liable for the harm. *Id.* In making the plausibility determination, the Court relies on its "judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). The complaint (or counterclaim) should be dismissed only if the plaintiff or counter-plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations. *Christensen v. Cty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007) (citations omitted). That being said, a "pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). For purposes of this motion, the Court accepts as true all well-pleaded allegations in the complaint and counterclaim and draws all reasonable inferences in favor of the non-moving party. *See Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

**DISCUSSION**

**I.     Defendants' Motion To Dismiss**

    **A.     Background[1]**

ATG, an Illinois corporation with its principal place of business in Illinois, is a licensed interstate freight broker, meaning that it arranges for the transportation of freight tendered by shippers (its customers) by motor carriers. (Dkt. 1) at ¶¶ 1–2. Power is an Indiana citizen and a

---

[1] The facts are drawn from ATG's complaint. For the purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. *See Killingsworth*, 507 F.3d at 618.

former employee of ATG. *Id*. at ¶ 3. DTS is also a licensed interstate freight broker and is a Pennsylvania corporation with its principal place of business in New Jersey. *Id*. at ¶ 4.

From August 2002 to April 2017, Power was employed by ATG as either a sales representative or a sales manager. In those positions, Power both (1) solicited and serviced ATG's customers and also (2) recruited, trained, and managed other customer sales representatives. *Id*. at ¶ 9. For his job, Power was privy to and used ATG confidential information, like customer files that ATG "cultivated over years of business with said customers" and maintained at great expense and time. *Id*. at ¶¶ 10–11, 16.

On February 20, 2006, Power entered into an Employee Confidentiality and Non-Compete Agreement ("Agreement"), which is attached as Exhibit A to ATG's complaint. *See id*. at ¶ 12; (Dkt. 1-1). The Agreement provided that Power would "keep secret and confidential, and not use, copy or assist any other person or firm in the use, disclosure or copying of any of ATG's confidential information" both during and after his term of employment with ATG. (Dkt. 1-1) at 1. With regard to non-competition and non-solicitation, the Agreement provided:

> In addition, Employee further agrees that during the period that Employee is working at ATG and during the period of one (1) year [*Also for a one year period following termination of employment,*] following termination of employment with ATG, for whatever reason, Employee shall not directly or indirectly work at or have any financial interest in or be in any way connected or affiliated with, or render advice or services to, any business similar to that of ATG or that of a freight broker. [*3 months*] During this period, Employee also agrees not to directly or indirectly divert, take away or solicit any customer or carrier of ATG. Employee specifically acknowledges and agrees that this short term of one (1) year will not preclude Employee from being gainfully employed and that if Employee was no longer working at ATG, for whatever reason, and wanted to work in the same industry for a competitor of ATG that these specific restrictions are reasonable to protect ATG, the business and the other employees of ATG.

*Id*. In other words, Power agreed to a non-compete provision that prohibited him, during his employment with ATG and for three months following his termination, from directly or indirectly working at, having a financial interest in, being connected or affiliated with, or rendering advice or services to "any business similar to that of ATG or that of a freight broker." (Dkt. 1) at ¶ 15. The remainder of the paragraph contains a non-solicitation provision, whereby

3

Power agreed to not directly or indirectly divert or solicit any customer or carrier of ATG. *Id*. at ¶ 14. In between the non-compete clause and the non-solicitation clause is a handwritten modification reading "[a]lso for a one year period following termination of employment." *See* (Dkt. 1-1). ATG alleges that all of the handwritten modifications were added by Power and that the one-year handwritten addition applies to the non-solicitation clause. (Dkt. 1) at ¶¶ 12, 14.

While Power was employed by ATG, DTS, one of ATG's competitors, contacted him and offered him employment and compensation; DTS did this to get access to ATG's confidential customer files. *Id*. at ¶ 29. On April 13, 2017, Power's employment was "voluntarily terminated" and ATG immediately began experiencing a drop in business from Power's customers. *Id*. at ¶¶ 17–18. ATG alleges Power downloaded and disclosed confidential ATG customer information to DTS in violation of his Agreement. Less than three months after Power's termination, he formally took up employment with DTS. *Id*. at ¶¶ 17, 19–20. Further, Power solicited or diverted at least three of ATG's customers to DTS while he was still employed by ATG and he also used the confidential information while working for DTS to take other customers away from ATG. *Id*. at ¶¶ 19, 21. ATG claims to have lost $800,000 in revenue on account of Power's actions. *Id*. at ¶ 22.

In November 2017, ATG filed a four-count complaint alleging: breach of the Agreement's confidentiality, non-compete, and non-solicitation provisions by Power (Count I); tortious interference with Power's Agreement's confidentiality, non-competition, and non-solicitation provisions by DTS (Count II); tortious interference with ATG's business relationships by Power and DTS (Count III); and civil conspiracy (Count IV). (Dkt. 1). ATG seeks injunctive relief, an accounting of all customers "disclosed, solicited and diverted from

ATG" to DTS, compensatory damages, and punitive damages of $1.6 million. Defendants have moved to dismiss ATG's complaint.

B.     **Breach of Contract Against Power (Count I)**

ATG's breach of contract claim asserts three restrictive covenants in Power's Agreement: a confidentiality provision, a non-competition provision, and a non-solicitation provision. Under Illinois law, which is the governing law selected by the Agreement and which the parties appear to agree applies to their claims, a post-employment restrictive covenant is enforceable if it was ancillary to a valid employment relationship and contains a reasonable restraint. *Reliable Fire Equip. Co. v. Arrendondo*, 2011 IL 111871, at ¶¶ 16–17. There is no dispute here that Power entered into a restrictive covenant agreement during his employment with ATG or that the restrictive covenants were ancillary to a valid employment relationship, since Power worked for ATG for nearly eleven years after signing his Agreement. (Dkt. 1) at ¶¶ 12, 17; *see also Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016) (continued employment for two years after executing restrictive covenant constitutes valid employment relationship) (citing cases). Rather, Defendant argues that the restrictive covenants are unenforceable because the Agreement contains terms that are indefinite and unintelligible and also because the restrictive provisions are not reasonable.

For a contract to be valid and enforceable, its terms and provisions must be sufficiently certain and definite to enable a court to determine what the parties agreed to do, and while some nonessential terms may be missing or left to be agreed upon, the parties' failure to agree upon an essential term of the contract indicates that mutual assent is lacking and there is no enforceable contract. *Rose v. Mavrakis*, 343 Ill. App. 3d 1086, 1090–91 (1st Dist. 2003); *see also Szafranski v. Dunston*, 2015 IL App (1st) 122975–B, ¶ 67 (to be enforceable, the material terms of a

contract must also be definite and certain) (citation omitted).  Here, Defendants make no argument that the confidentiality restriction is indefinite or ambiguous.  Instead, they argue that the insertion of the handwritten phrase—"[a]lso for a one year period following termination of employment"—in the fourth paragraph of the seven-total-paragraph Agreement, between the non-competition provision and the non-solicitation provision is so confusing that all of the Agreement's restraints cannot be enforced. (Dkt. 15) at 7–8.  Specifically, Defendants argue that this clause makes no sense when attached to the non-compete provision that precedes it, because it contradicts the three-month time period already contained in that provision.  Alternatively, if the handwritten clause is read with the non-solicitation provision, the provision contains grammatical errors and is "unintelligible" because, in Defendants' view, either a one-year period or a three-month restrictive period could apply.  *Id.*  But ATG alleges in its complaint that the disputed clause applies to the non-solicitation provision, thereby giving it one-year durational term. (Dkt. 1) at ¶ 14.  The Agreement does not contradict this reading.  Therefore, at this time, the Court cannot conclude that the disputed clause either creates confusion that is fatal to any restrictive covenant much less as to all restrictive covenants contained in the Agreement.[2]

*Lincoln Park Sav. Bank v. Binetti*, 2011 WL 249461 (N.D. Ill. Jan. 26, 2011), cited by Defendants, is distinguishable. (Dkt. 15) at 6–7.  In *Binetti*, the non-competition agreement stated only that former employees would "comply with a 1–year non-compete agreement if the Mortgage Loan Officer terminates employment with Lincoln Park Savings Bank voluntarily." 2011 WL 249461, at *4.  In spite of this language, Lincoln Park Savings Bank offered a more precise interpretation of the non-complete clause in its complaint and offered a different

---

[2] Moreover, even if the Court did find that this handwritten clause inserted enough ambiguity to require dismissal of any allegations based on either the non-competition clause or non-solicitation clause, ATG's claim for breach of contract based on the alleged breach of the confidentiality provision of the Agreement would still stand.

6

explanation of the clause in its motion to dismiss briefing—and neither explanation was supported by the contract language. Because of this confusion on the part of the bank, the court held that the bank failed to state a claim for breach of contract. In contrast, ATG has not created similar confusion: it has consistently interpreted the non-solicitation provision of the agreement to contain the handwritten one-year post-termination term, and the Agreement does not contradict that reading. Moreover, in *Binetti*, the court did not find that breach of contract claim failed because the contract at issue was indefinite and therefore unenforceable. Instead, on the enforceability point, the court stated in dicta that it "appears unlikely that such an undefined restrictive covenant can be enforced. *Binetti*, 2011 WL 249461, at *4. Accordingly, *Binetti* does not affect the result here.

The same is true for *Unisource Worldwide, Inc. v. Carrara*, 244 F. Supp. 2d 977 (C.D. Ill. 2003), because of different problems with the non-competition clause at issue there (and ignoring, for purposes of this discussion, the different procedural posture of that case). (Dkt. 15) at 7–8. The non-competition agreement in that case contained a fragment of a sentence without any transitional language that literally contradicted the sentence that preceded it. *Unisource Worldwide*, 244 F. Supp. 2d at 982. On the basis of this language, the court could not decipher the terms to which the parties had agreed, and therefore concluded that the contract was not enforceable. The disputed handwritten modification in this case does not create the same confusion. Power agreed to the restrictive covenants and nothing in the handwritten modification literally contradicts anything in the non-solicitation provision. At its worst, the handwritten modification creates confusion as to the duration of the non-solicitation clause: three months or one year? Again, ATG alleges that the term endures for one year, and drawing

all inferences in ATG's favor at this point, the clause is sufficiently clear to withstand a facial challenge to its validity and to allow ATG to proceed to discovery.

Defendants next argue that the Agreement is unenforceable and the breach-of-contract claim should be dismissed because the non-competition provision is geographically unlimited and the non-solicitation provision is unlimited in scope. (Dkt. 15) at 9–10. Under Illinois law, covenants not to compete are disfavored and held to a high standard. *See, e.g.*, *Medix Staffing Solutions, Inc., v. Daniel Dumrauf*, 2018 WL 1859039, at *2 (N.D. Ill. Apr. 17, 2018) (citing *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447 (1st Dist. 2007)). Although an employer faces a heavy burden to ultimately prevail, courts will only find such covenants facially invalid in "extreme cases." *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 21 (2d Dist. 1993). "[U]nless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record." *Allied Waste Servs.*, 177 F. Supp. 3d at 1110.

Illinois law requires consideration of three factors to determine whether a restrictive covenant contains a reasonable restraint: (1) whether the restraint is greater than required to protect a legitimate business interest of the employer-promisee, (2) whether it imposes an undue hardship on the employee-promisor, and (3) whether it poses an injury to the public. *Reliable Fire*, 2011 IL 111871, at ¶ 17. The first of these factors, in turn, is "based on the totality of the facts and circumstances of the individual case," including without limitation "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id*. at ¶ 43. None of these subsidiary factors "carries any more weight than any other," rather, the importance of each is fact dependent. *Id*. Because Defendants do not raise arguments regarding the other factors pertinent

to assessing the clauses' reasonableness, the Court will address only the geographic and activity restrictions.

Regarding the non-competition clause's breadth, the lack of a geographic limitation is not *per se* unreasonable. *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 308 Ill. App. 3d 337, 344 (1st Dist. 1999); *see also Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 292 Ill. App. 3d 131, 139 (2d Dist. 1997). "Generally, courts will uphold a restriction on competition that is coextensive with the area where the promisee is doing business." *Liautaud v. Liautaud*, 221 F.3d 981, 988 (7th Cir. 2000) (citing *Lawrence & Allen, Inc.*, 292 Ill. App. 3d 131). Here, ATG alleges that the clauses' geographic scope, which includes no limitation, is necessary because ATG's business involves the transportation of freight across the entire United States. *See* (Dkt. 24) at 7–8. In addition, ATG argues that the fluid nature of its business means that the exact geographic location of the broker is irrelevant to the ability of the broker to perform its services, and therefore a geographic restriction would be confusing and difficult to enforce. *Id.* at 8. *Lawrence & Allen, Inc.*—cited by Defendants—presented a different situation. The non-competition clause in that case prevented the plaintiff's former employee from competing with plaintiff in virtually any capacity in the entire corporate employee outplacement industry in the United States. But the plaintiff's office was located in Naperville, Illinois, and the court could find no other evidence in the summary judgment record that plaintiff's clients were located nationwide. 292 Ill. App. 3d. at 139. Viewing all of these facts, the court there found the geographic breadth of the clause to be unreasonable. The Court reaches a different result here. Taking all reasonable inferences in ATG's favor, the Court cannot find the Agreement's non-competition is geographically unreasonable as a matter of law at this stage, particularly in light of ATG's assertions about its business and the relatively short duration of the clause.

Looking next at the non-solicitation clause's activity restrictions, Illinois courts are "hesitant to enforce noncompetition agreements that prohibit employees from soliciting or servicing not only customers with whom they had direct contact, but also customers they never solicited or had contact with while employed." *Eichmann*, 308 Ill. App. 3d at 345. "Courts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not those whose effect is to prevent competition *per se*." *Id.* (citation and quotation omitted). Still, the Court's assessment of the employer's legitimate business interest in instituting the restrictions in the manner in which it did involves a multifactor test of reasonableness: "whether a legitimate business interest exists is based on the totality of the facts and circumstances of the individual case." *Reliable Fire*, 2011 IL 111871, ¶ 43.

Based on the law as set forth by the Illinois Supreme Court in *Reliable Fire*, a non-solicitation provision's lack of limitations on the customers to which it applies does not render it *per se* unreasonable. *Traffic Tech, Inc. v. Kreiter*, 2015 WL 9259544, at *6 (N.D. Ill. Dec. 18, 2015). Indeed, despite the alleged shortcoming in the Agreement, ATG argues that the non-solicitation provision is reasonable because (1) it is limited to one year after termination, (2) it is limited to customers and carriers of ATG. (Dkt. 24) at 10. With regard to that last piece, ATG argues that the customer limitation should be read in context with the entire Agreement and, when doing so, only applies to ATG customers and carriers that Power, "with the assistance of ATG . . . will develop, acquire and use"—language from the confidentiality restriction. *Id.* But ATG's interpretation of the non-solicitation clause in this way is not supported by the Agreement. As written, it applies to all of ATG's customers and carriers, not just those that Power serviced. In any event, even as broadly written, the reasonableness of this provision depends on the specific facts and circumstances of this individual case—facts that still must be

developed, such as, the number of customers or carriers of ATG and the number within that group with whom Powers worked. Because the non-solicitation clause in Power's Agreement is not categorically unreasonable as a matter of law, *Traffic Tech, Inc.*, 2015 WL 9259544, at *7, Defendants' arguments that the Agreement is unenforceable are insufficient to defeat ATG's claim at this stage.

### C. Tortious Interference with a Contract Against DTS (Count II)

Defendants' motion to dismiss Count II of the complaint relies entirely upon same enforceability arguments regarding the Agreement that they raised with respect to Count I. Because the Agreement is not fatally unintelligible and the restrictive covenants in the Agreement are not patently overbroad at this stage of the proceedings, the tortious interference claim will not be dismissed for the same reasons set forth above.

### D. Tortious Interference with Business Relationships Against Power and DTS (Count III)

Defendants make no explicit argument regarding ATG's tortious interference with business relationships claim against them, but instead seek dismissal of the entire complaint on their contract-enforceability arguments. *See* (Dkt. 15) at 6–10. Again, to the extent that this claim involves the Agreement and Defendants are relying on their arguments regarding the enforceability of the Agreement, this claim survives dismissal for the reasons set forth above. And to the extent that this claim does not involve the Agreement, it also survives dismissal because Defendants do not raise any non-Agreement-related arguments.

### E. Civil Conspiracy (Count IV)

ATG also asserts a civil conspiracy claim. "Under Illinois tort law, a civil conspiracy requires '(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by

one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff.'" *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017) (citation omitted); *see also Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994) ("A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort."). However, a "conspiracy claim alleging a tort as the underlying wrongful act is duplicative where the underlying tort has been pled." *Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996); *see LoggerHead Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775, 784 (N.D. Ill. 2013) ("Additionally, to the extent the underlying tort of the alleged civil conspiracy, fraud, is already alleged by [the plaintiff], the civil conspiracy claim is rendered duplicative."). More specifically, "because a successful conspiracy claim enables a plaintiff to hold co-conspirators jointly liable for actions by other members of the conspiracy, a conspiracy claim is only actionable if it is based on new facts or seeks to extend liability for the underlying tort to new defendants." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1159 (N.D. Ill. 2016) (internal citations omitted); *accord Real Colors, Inc. v. Patel*, 974 F. Supp. 645, 651 (N.D. Ill. 1997)

Here, ATG's allegations are essentially conspiracy to breach the confidentiality, non-compete, and non-solicitation clauses in Power's Agreement and conspiracy to damage ATG's business and customer relationships. *See* (Dkt. 1) at ¶¶ 41–42; *see also id.* at ¶ 43 (alleging the following overt acts: "the disclosure and use of confidential and proprietary ATG information, competing against ATG within three months of termination and soliciting established ATG customers within the past year"). As is evident, the same underlying state law torts—tortious interference with a contract and tortious interference with business relationships—are the basis for the state law civil conspiracy claim. That is, ATG fails to set forth facts not already

presented in Counts II and III nor does it seek to extend liability to additional defendants. Thus, the state law civil conspiracy claim is duplicative and not actionable as a separate claim.

F. **Punitive Damages**

Defendants also request dismissal of ATG's request for punitive damages on Counts II, III, and IV. (Dkt. 15) at 12–13. But these punitive damages requests are not separate claims; they are parts of claims. And the Court does not have power to dismiss parts of claims on a Rule 12(b)(6) motion to dismiss. *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief."). None of the state court cases cited by Defendants support dismissal of only pieces of the claims at this early stage. As a final point here, even construing Defendants' request as a Federal Rule of Civil Procedure 12(f) motion to strike the requests for punitive damages (which is the appropriate vehicle for such a request), the requests stand at this time. *See Campbell v. City of Johnston City*, 2005 WL 3440726, at *1 (S.D. Ill. Dec. 14, 2005) (finding that request to strike punitive damages falls under Rule 12(f)). Whether punitive damages can be awarded for a particular cause of action is a question of law, but whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is a fact question the for the jury to decide. *Medow v. Flavin*, 336 Ill. App. 3d 20, 35 (1st Dist. 2002). Construing ATG's allegations as true and taking all reasonable inferences in its favor, it has sufficiently alleged that DTS intentionally induced Power to breach the Agreement and that both Defendants purposefully interfered with ATG's customer relationships. It may become evident in the course of the proceedings that punitive damages are not recoverable, but at this stage in the litigation, the requests remain.

## II. ATG's Motion to Dismiss

### A. Background[3]

In response to ATG's complaint, Power and DTS have filed a one-count counterclaim for abuse of process. (Dkt. 37). In particular, Defendants allege that in February 2006, ATG's CEO, Harold Gross, began requiring all current employees to sign restraint agreements. Power initially did not want to sign an agreement, but Gross insisted, and they agreed to "modify the printed version of the restraint, which called for a non-compete, non-solicitation period after termination of one year." *Id*. at ¶¶ 11–13. Accordingly, Power "crossed out the one year period for the restraint and wrote in the words '3 months'" and he initialed the change and signed the Agreement. *Id*. at ¶ 15. But Defendants allege that was the only modification to the Agreement that was written or approved by Power and that any further modifications were added after Power signed the agreement and delivered it to ATG. *Id*. at ¶¶ 20–21. Specifically, Defendants claim that Power never saw Gross execute the Agreement nor was he given a copy of the fully executed agreement for his records. Instead, the first time he saw a fully executed version was when counsel for ATG enclosed a copy of the Agreement in correspondence that Power received in October 2017. *Id*. at ¶¶ 18–19. Accordingly, Defendants assert that ATG "purposely and intentionally altered" the Agreement after Power signed it by adding the "[a]lso for a one year period following termination of employment" language between the non-compete clause and the non-solicitation clause. *Id*. at ¶ 23. Therefore, Defendants argue that ATG "wrongfully invoke[d] the coercive power of this Court to bar Power from 'solicitation' for one year[,] impair legitimate business competition between the parties," and "intimidate and send a message to ATG's employees and competitors that it takes restrictive covenants seriously based on a

---
[3] The facts are drawn from Defendants' counterclaim. For the purposes of ATG's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the counterclaim. *See Killingsworth*, 507 F.3d at 618.

14

handwritten modification added to the alleged restraint agreement *after* Power executed it." *Id*. at ¶¶ 26–27 (emphasis in original). Defendants argue that ATG has "wrongfully compelled" them to "litigate non-existent claims." *Id*. at ¶ 28. In briefing this issue, Defendants further argue that ATG relied on the modified non-solicitation clause in alleging damages that meet the jurisdictional threshold for diversity jurisdiction. (Dkt. 46) at 4. ATG has moved to dismiss the counterclaim, arguing that Illinois law does not recognize tort actions based on a party's filing of a lawsuit to enforce its contractual rights. (Dkt. 40).

B.     **Abuse of Process**

Under Illinois law, abuse of process is the misuse of legal process to accomplish some purpose outside the scope of the process itself, that is, to accomplish a purpose for which it was not designed. *See West v. West*, 694 F.3d 904, 906 (7th Cir. 2012); *Bonney v. King*, 201 Ill. 47, 50–51 (1903). The two distinct elements of an abuse of process claim are: (1) the existence of an ulterior purpose or motive, and (2) some act in the use of process that is not proper in the regular course of proceedings. *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill. App. 3d 177, 182–83 (2d Dist. 2003) (citing *Holiday Magic, Inc. v. Scott*, 4 Ill. App. 3d 962, 966 (1st Dist. 1972)); *see also Kumar v. Bornstein*, 354 Ill. App. 3d 159, 165–66 (2d Dist. 2004). For the first element, a claimant must plead facts that show that the defendant instituted proceedings against it for an improper purpose, such as extortion, intimidation, or embarrassment. *Kumar*, 354 Ill. App. 3d at 165. In order to satisfy the second element, the plaintiff must plead facts that show a misapplication of process, or, in other words, the plaintiff must show that the process was used to accomplish some result that is beyond the purview of the process. *Id*. at 166. The tort of abuse of process is not favored under Illinois law, and therefore the elements must be strictly construed. *Neurosurgery*, 339 Ill. App. 3d at 183.

Defendants allege that ATG filed suit to "intimidate and restrain" Defendants and harm their business, to wrongfully impede business competition between DTS and ATG, and to "intimidate" ATG's current employees. (Dkt. 37) at ¶¶ 24, 26, 27. These allegations may be sufficient to satisfy the first element of an abuse-of-process claim, but Defendants' counterclaim fails to meet the heightened pleading requirements for the second element—indeed, the gravamen—of the claim. Although neither an indictment nor an arrest is a necessary element to bring an abuse of process claim under Illinois law, a plaintiff is required to plead some improper use of legal process, *Kumar*, 354 Ill. App. 3d at 165; Defendants here fail to sufficiently allege that ATG sought to manipulate legal process at all, let alone use process for a purpose other than that for which the process was designed. ATG filed a lawsuit to enforce its contractual rights and alleging other common law violations. Defendants may feel that the bases of some or all of ATG's claims are meritless and/or improper, but even the "[i]nstitution of frivolous proceedings is insufficient conduct to support a claim of abuse of process." *Stoller v. Johnson*, 2017 IL App (1st) 161613-U, ¶ 35 (quoting *McGrew v. Heinold Commodities, Inc.*, 147 Ill. App. 3d 104, 111 (1st Dist. 1986)); *accord Reed v. Doctor's Assocs., Inc.*, 355 Ill. App. 3d 865, 875–76 (5th Dist. 2005); *Neurosurgery*, 339 Ill. App. 3d at 183 ("the mere issuance of a summons cannot give rise to an abuse of process"). In other words, Defendants do not have a viable claim for abuse of process based on the alleged intimidation and manipulation contained in ATG's *pleadings*. *See Holiday Magic*, 4 Ill. App. 3d at 968 ("Pleading must be distinguished from process. Pleadings are created and filed by the litigants. Process is issued by the court, under its official seal."). Despite Defendants' argument that their alleged abuse of process does not arise from the pleadings, their complaint that ATG's actions in filing this lawsuit (on what they believe to be

improper grounds) and seeking injunctive relief leads the Court to no other conclusion. (Dkt. 46) at 9.

To be fair, Defendants' apparent argument that ATG's jurisdictional allegations are fraudulent comes closer to the mark, but this argument also fails. *Id*. Significantly, the counterclaim does not specifically allege that ATG's jurisdictional allegations are manipulated or fraudulent (*see* (Dkt. 37) at ¶¶ 23–30), and even if it did, Defendants' abrupt argument on this point is nothing more than conclusions and conjecture. *See* (Dkt. 46) at 9–10 ("Absent Plaintiff's reliance upon the altered restraint agreement, Defendants allege that the amount in controversy required to confer diversity jurisdiction over them . . . would be lacking."). The do not even try to explain what portion of ATG's alleged damages were incurred on account of the non-solicitation clause as opposed to the other restrictive covenants and allegations. This is particularly true in light of ATG's four (now three) claims—not all of which rise or fall on the non-solicitation agreement alone—and its request for a total of $800,000 in compensatory damages and $1.6 million in punitive damages. *See* (Dkt. 1). Again, Defendants fall short of alleging that any *process* was misused by ATG, and therefore, their counterclaim cannot survive.

Not only does the counterclaim lack sufficient allegations to state a plausible abuse of process claim, it rests on the flawed premise that ATG's entire suit rests on the allegedly manipulated language adding a time-period to the non-solicitation clause. Not so. The challenged alteration only affects—at best—only *some* of ATG's claims. Defendants fail to acknowledge that ATG's lawsuit encompasses claims in addition to those based on the non-solicitation provision: Power's breach of the confidentiality provision in the Agreement, Power's breach of the non-competition provision in the Agreement, DTS's tortious interference with the confidentiality and non-competition provisions in the Agreement, and DTS's and

17

Power's tortious interference with ATG's business relationships independent of the Agreement. *See* (Dkt. 1). Defendants do not allege that the confidentiality or non-competition provisions of the Agreement were manipulated or that the claims based on those provisions are illegitimate, nor do Defendants allege that the tortious interference claim was brought in bad faith. Accordingly, Defendants' argument that ATG's lawsuit constitutes an abuse of process because certain allegations and damages calculations are based on one contractual provision that was altered ignores the many other bases on which the suit is brought. The presence of these other claims serves undercut Defendants' counterclaim on both abuse-of-process elements: first, because the filing of legitimate claims is proper (regardless of whether they appear alongside allegedly illegitimate claims); and second, because diversity jurisdiction and legal merit may be established by the unchallenged claims.[4]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss (Dkt. 14) as to Count IV and denies the motion in all other respects. The Court further grants ATG's motion to dismiss Defendants' counterclaim. (Dkt. 40). As a housekeeping matter, ATG's earlier filed motion to dismiss (Dkt. 29), which was rendered moot by Defendants' amended counterclaim (Dkt. 37), is stricken.

_____
Hon. Virginia M. Kendall
United States District Judge

Date: April 27, 2018

---

[4] Because the Court finds that the counterclaim does not sufficiently allege the elements of a claim for abuse of process, it does not reach ATG's Fed. R. Civ. P. 12(b)(1) argument that the counterclaim is permissive as opposed to compulsory and that the Court should decline to exercise supplemental jurisdiction over the counterclaim. (Dkt. 40) at 9–12.